J-A16011-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| NICHOLAS D. ANDREWS, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| CROSS ATLANTIC CAPITAL PARTNERS, INC., | |
| Appellee | |

| | |
|---|---|
| NICHOLAS D. ANDREWS, | |
| Appellant | |
| v. | |
| DONALD R. CALDWELL, | |
| Appellee | No. 1694 EDA 2014 |

Appeal from the Judgment Entered May 22, 2014
in the Court of Common Pleas of Chester County
Civil Division at Nos.: 2011-06164
2011-09776-CT

| | |
|---|---|
| NICHOLAS D. ANDREWS, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| CROSS ATLANTIC CAPITAL PARTNERS, INC., | |
| Appellant | |

J-A16011-15

NICHOLAS D. ANDREWS,

                    Appellee

                    v.

DONALD R. CALDWELL,

                    Appellant                No. 1825 EDA 2014


Appeal from the Judgment Entered May 22, 2014
in the Court of Common Pleas of Chester County
Civil Division at No.: 2011-06164


NICHOLAS D. ANDREWS,              IN THE SUPERIOR COURT OF
                                             PENNSYLVANIA

                    Appellant

                    v.

CROSS ATLANTIC CAPITAL PARTNERS,
INC.,

                    Appellee

NICHOLAS D. ANDREWS,

                    Appellant

                    v.

DONALD R. CALDWELL,

                    Appellee                No. 1934 EDA 2014


Appeal from the Judgment Entered May 22, 2014
in the Court of Common Pleas of Chester County
Civil Division at No.: 2011-06164-CT


- 2 -

J-A16011-15

BEFORE:  LAZARUS, J., JENKINS, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED SEPTEMBER 09, 2015**

In these consolidated cross-appeals, Appellants, Cross Atlantic Capital Partners (Cross Atlantic) and Donald R. Caldwell (Caldwell),[1] and Appellee/Cross-Appellant, Nicholas D. Andrews (Andrews), appeal from the Judgment entered on May 22, 2014, following a jury verdict in favor of Andrews and against Cross Atlantic and Caldwell in this action pursuant to Pennsylvania's Wage Payment and Collection Law (WPCL), 43 Pa.C.S.A. §§ 260.1-260.12, and breach of contract.  For the reasons discussed below, we affirm in part and quash in part.

We take the underlying facts and procedural history in this matter from the trial court's prior opinions and our review of the certified record.

> Cross Atlantic is a corporation in the business of recruiting individual investors, institutional investors, and mutual fund managers who are seeking investment opportunities.  These investors enter into a partnership agreement with Cross Atlantic who holds the investors' funds and then uses those funds to invest in start-up companies.  The partnership agreement between Cross Atlantic and the investors states how to disburse the investors' funds, any returns, fees, costs, etc., including the payment of any management fees due to Cross Atlantic.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] At the time of trial, Caldwell was the Chief Executive Officer for Cross Atlantic.  (**See** N.T. Trial, 8/27/13 (pm), at 17).

- 3 -

Andrews worked for Cross Atlantic from the summer of 1999 through the summer of 2000. Cross Atlantic's [President][2] at the time, Glenn Rieger, hired Andrews to find, negotiate, and manage investments for Cross Atlantic. The ultimate goal was to sell the investments at a price that was sufficient to repay the investors their funds and to allow both the investors and Cross Atlantic to realize a profit. During his employment with Cross Atlantic, Andrews did not have a written employment agreement, as is customary in the industry. Compensation is deferred until the investment funds become sufficiently profitable to make corporate distributions.[3] However, Andrews'[] employment ended before his funds made any corporate distributions. Therefore, on July 5, 2000, the parties entered into the [s]eparation [a]greement. Paragraph 5 of the [s]eparation [a]greement ("[p]aragraph 5")[4] stated how and

_____

[2] The trial court mistakenly states that Reiger was the Chief Executive Officer during the period in question. Trial testimony reflects that he was Cross Atlantic's president. (**See** N.T. Trial, 8/27/13 (pm), at 47).

[3] Andrews did receive a salary during his period of employment with Cross Atlantic. (**See** N.T. Trial, 8/26/13, at 110).

[4] Paragraph 5 states:

By the end of this Severance Period, you will have vested one year of services towards 1.0% of carried interest in Cross Atlantic Technology Fund, L.P. and 0.5% carried interest in the Co-Investment 2000 Fund, L.P. Therefore, you will receive 0.2% and 0.1% carried interest as your earned and vested carry in Cross Atlantic Technology Fund, L.P. and The Co-Investment 2000 Fund, L.P., respectively. In addition, as special consideration for your effort put forth on GAIN Capital, we will offer you a full 1.0% and 0.5% carried interest on that particular transaction to be earned, paid and distributed at such time that the distribution is made to all other Limited Partners of the funds. Distributions of your participation in these carried interests will be in all cases identical to what you would have received if still employed by the funds.

(Separation agreement, 7/05/00, at 2 ¶ 5).

when Andrews was to be compensated. Andrews'[] WPCL and breach of contract claims arose from the parties' very different and divergent interpretations of [p]aragraph 5.

(Trial Court Opinion, 1/16/15, at 2-3).

The dispute centered on the interpretation of the third sentence of paragraph 5 and the meaning[5] of the term "carried interest."[6] (**See** Cross Atlantic and Caldwell's Brief, at 55; Andrews' Brief, at 58). The third sentence states, "[i]n addition, as special consideration for your effort put forth on GAIN Capital, we will offer you a full 1.0% and 0.5% carried interest on that particular transaction to be earned, paid and distributed at such time that the distribution is made to all other Limited Partners of the funds." (Separation agreement, 7/05/00, at 2 ¶ 5).

Cross Atlantic and Caldwell argued that the term "carried interest" meant the same thing in sentences one and two as it did in sentence three,

_____

[5] The separation agreement does not define carried interest. (**See** N.T. Trial, 8/27/15 (pm), at 41).

[6] Nasdaq defines carried interest as:

> In private equity fund or hedge fund, carried interest is a share of the profits of a successful partnership that is paid to the manager of the partnership as a form of compensation. Carried interest is typically up to 20% of the profits and becomes payable once the original investment in the fund has been repaid to the investors, plus a predefined hurdle rate.

Nasdaq, Investing, Glossary,
http://www.nasdaq.com/investing/glossary/c/carried-interest (last visited July 24, 2015).

defining it as "an entitlement to a portion of a fund's excess profits, if any." (**See** Cross Atlantic and Caldwell's Brief, at 9). Andrews argued that sentences one and two referred to a "Fund-Level carried interest" that he defined as "an interest in a portion of the proceeds of all of [the fund's] investments. (Andrew's' Brief, at 15 n. 5 (record citations omitted); **see also id.** at 13-15). However, he averred that, as a reward for his work in securing the GAIN investment, he was entitled to "Deal-Specific carried interest" which he defined as a "portion of the proceeds of one of [the fund's] investments, GAIN." (**Id.** at 15 n.5; **see id.** at 13-15).

On September 2, 2011, Andrews filed two complaints, one against Cross Atlantic for breach of contract and violations of the WPCL, and one against Caldwell personally under the WPCL. A five-day jury trial took place in August 2013. At trial, Cross Atlantic and Caldwell argued, as they had in earlier pleadings, that the trial court should find as a matter of law that the statute of limitations barred Andrews' claims. (**See** Brief of Defendants in Support of their Motion for Summary Judgment, 12/14/12, at 15-17; N.T. Trial, 8/27/13 (am), at 72-76). They claimed that no reasonable jury could find that Andrews was unaware, as of September 2003, following an exchange of e-mails between Andrews and Cross Atlantic that they did not intend to honor the separation agreement. (**See id.** at 15-17; **id.** at 72-76; **see also** Trial Exhibit E-Mail chain, September 4-9, 2003, at Plaintiff's Exhibit 6 pp. 1-2). Further,

> Cross Atlantic argued to the jury that [p]aragraph 5 did not entitle Andrews to any compensation because: (1) the event that was to trigger payment to Andrews did not occur, (2) the three year statute of limitations barred Andrews'[] WPCL claims, and (3) the four year statute of limitations barred Andrews'[] breach of contract claims. Andrews disagreed. It was Andrews'[] position that the triggering event did occur and that [Cross Atlantic and Caldwell] concealed it from him. Andrews argued his claims were timely pursuant to the discovery rule because [Cross Atlantic and Caldwell's] conduct delayed Andrews'[] discovery of his claims.

(Trial Ct. Op., 1/16/15, at 3).

After Andrews rested, the trial court granted Cross Atlantic and Caldwell's motion for a nonsuit as to the payment that became due in September 2003, finding that the statute of limitations barred Andrews' right to recover. (**See** N.T. Trial, 8/28/13, at 81). However, the trial court denied the motion for a nonsuit as to payments becoming due after 2003. (**See id.** at 81-82).

Following trial, the jury returned a verdict in favor of Andrews and against Cross Atlantic and Caldwell, awarding damages of $742,221.45. On September 9, 2013, Cross Atlantic and Caldwell filed a joint post-trial motion; that same day, Andrews filed a motion to mold the verdict seeking to include pre-judgment interest, post-judgment interest, and liquidated damages pursuant to 42 Pa.C.S.A. § 260.10. Andrews also filed a petition for attorneys' fees and costs in connection with his successful WPCL claims on September 9, 2013.

On December 19, 2013, the trial court denied Cross Atlantic and Caldwell's post-trial motion. That same day, the trial court issued an order awarding Andrews pre-judgment interest in the amount of $216,268.75, but denying his request for liquidated damages, and denying, without prejudice, his request for post-judgment interest. On May 5, 2014, the trial court granted Andrews' request for attorneys' fees, awarding fees of $303,127.50, but denying his request for costs and expert fees. On May 22, 2014, the prothonotary entered judgment in favor of Andrews and against Cross Atlantic and Caldwell.

On June 3, 2014, Andrews filed an appeal of the trial court's May 5, 2014 order regarding attorneys' fees and costs. On June 6, 2014, the trial court ordered Andrews to file a concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(b). On June 25, 2014, Andrews filed his Rule 1925(b) statement. On August 28, 2014, the trial court filed an opinion. *See* Pa.R.A.P. 1925(b).

On June 18, 2014, Cross Atlantic and Caldwell filed a notice of appeal from the May 22, 2014, entry of judgment. The trial court subsequently ordered them to file a Rule 1925(b) statement, and Cross Atlantic and Caldwell timely complied on July 15, 2014. The trial court issued an opinion on January 16, 2015.

On June 25, 2014, Andrews filed a second appeal again challenging the May 5, 2014 order with respect to attorneys' fees and costs and the

December 13, 2014 order denying his request for liquidated damages. On July 23, 2014, the trial court ordered Andrews to file a second Rule 1925(b) statement. Andrews complied on August 11, 2014. The trial court issued an opinion on December 19, 2014.

On appeal and cross-appeal, the parties raise the following questions:

I. Did payments that allegedly became due to [Andrews] under a separation agreement negotiated and executed two months after the termination of [Andrews'] employment; that were not earned by [Andrews] during his employment; and that were allegedly given to [Andrews] in exchange for entering into a non-compete agreement constitute "wages" under [the WPCL]?

II. Did [Cross Atlantic and Caldwell's] absolute and unequivocal repudiation of its alleged obligations under the separation agreement (as [Andrews] and the jury understood those obligations to be) start the accrual of the limitations period on [Andrews'] entire cause of action under the agreement, including as to future payments allegedly due under the agreement?

III. Was [Andrews'] interpretation of paragraph 5 of the separation agreement unreasonable as a matter of law when, among other things, his interpretation was irreconcilable with the paragraph's last sentence, required the assignment of two different meanings to the same term, and was inconsistent with the very relief he sought?

(Cross Atlantic and Caldwell's Brief, at 5).

I. Did the trial court err as a matter of law when it denied Andrews' request for liquidated damages where liquidated damages and pre-judgment interest are intended to remedy distinct harms?

II. Did the trial court err as a matter of law when it ruled that Andrews is not entitled to recover expert fees and costs in connection with his successful claims under the WPCL where such recovery is necessary to make Andrews whole?

- 9 -

(Andrews' Brief, at 7-8).

In their first issue, Cross Atlantic and Caldwell claim that "[t]he payments allegedly due under the post-employment separation agreement do not constitute 'wages' under [the WPCL]." (Cross Atlantic and Caldwell's Brief, at 36). Specifically, they argue that, under the facts of this case, separation pay does not constitute a wage within the meaning of the WPCL because it was not part of an employment contract and not compensation for employment. (*See id.* at 37-44). Because this issue raises a question of law, our standard of review is *de novo* and our scope of review is plenary. *See Thomas Jefferson Univ. v. Wapner*, 903 A.2d 565, 574 (Pa. Super. 2006). However, because we find that Cross Atlantic and Caldwell waived this claim, we will not reach its merits.

The record reflects that Cross Atlantic and Caldwell never raised the issue that the payments due were not wages under the WPCL because they were not part of an employment contract and were not compensation for employment. Cross Atlantic and Caldwell claim that they raised this issue in their proposed jury instructions, in objections to the jury instructions, and in their post-trial motion. (*See* Cross Atlantic and Caldwell's Brief, at 29-30). We disagree.

We have reviewed the documents in question; while Cross Atlantic and Caldwell may have raised an issue as to whether the payments were "wages" under the WPCL, they based it upon a completely unrelated legal

- 10 -

theory, that the payments were not wages because the monies were coming from a fund rather than directly from Cross Atlantic. (**See** Defendants' Proposed Supplemental Jury Instructions, 8/29/13, at 1-2; N.T. Trial, 8/30/13, at 12-13; Defendants' Brief in Support of their Motion for Post-Trial Relief, 11/12/13, at 41-42). An appellant cannot raise new legal theories for the first time on appeal. **See Commonwealth v. Truong**, 36 A.3d 592, 598 (Pa. Super. 2012) (*en banc*), *appeal denied*, 57 A.3d 70 (Pa. 2012) (citations omitted); **see also** Pa.R.A.P. 302(a).

Further, this claim is not included in their Rule 1925(b) statement, which reiterates the claim raised below, that the payments were not wages because the monies were coming from someone other than the employer. (**See** Cross Atlantic and Caldwell's Concise Statement of Errors Complained of on Appeal, 7/15/14, at 6 ¶ 3(a)). Thus, the trial court did not address it in its Rule 1925(a) opinion. (**See** Trial Ct. Op., 1/16/15, at 12-14). As amended in 2007, Pennsylvania Rule of Appellate Procedure 1925 provides that issues that are not included in the Rule 1925(b) statement or raised in accordance with Rule 1925(b)(4) are waived. **See** Pa.R.A.P. 1925(b)(4)(vii); **see also Commonwealth v. Lord**, 719 A.2d 306, 308 (Pa. 1998), *superseded by rule on other grounds as stated in* **Commonwealth v. Burton**, 973 A.2d 428, 431 (Pa. Super. 2009). Accordingly, we find that because Cross Atlantic and Caldwell raised an entirely different legal theory

before the trial court and in their Rule 1925(b) statement, they waived their first claim.

In their second issue, Cross Atlantic and Caldwell argue that the trial court erred in denying their post-trial motion for judgment not withstanding the verdict (JNOV) and/or for a new trial because, as a matter of law, the statute of limitations bars all of Andrews' claims because they absolutely repudiated the separation agreement in September 2003. (*See* Cross Atlantic and Caldwell's Brief, at 44-55; Defendants' Brief in Support of their Motion for Post-Trial Relief, 11/12/13, at 2-4).

Our standard of review of a trial court's denial of a motion for JNOV is as follows:

> A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the jury could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

***Am. Future Sys., Inc. v. BBB***, 872 A.2d 1202, 1215 (Pa. Super. 2005) (citation omitted), *affirmed*, 923 A.2d 389 (Pa. 2007), *cert. denied*, 552 U.S. 1076 (2007).

Further, "[t]rial courts have broad discretion to grant or deny a new trial . . . [and,] absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial." ***Kindermann v. Cunningham***, 110 A.3d 191, 193 (Pa. Super. 2015) (citations omitted).

Cross Atlantic and Caldwell contend that the statute of limitations[7] began running between September 4 and 9, 2003, when in response to an inquiry from Andrews about whether payments had become due to him from GAIN Capital, they anticipatorily repudiated the separation agreement. (***See*** Cross Atlantic and Caldwell's Brief, at 44-55). The e-mail exchange, in pertinent part, was as follows:

[Message from Andrews to Cross Atlantic:] . . .

I went over to my storage place and dug out the separation agreement and my attendant materials, and in reading the file confirmed that we have a genuine disagreement about the nature of the agreement. While this is not a big deal when the immediate amount involved is $11,000 I think we can agree that we are better off reconciling our views before the number goes up.

---

[7] We note that the statute of limitations for a claim under the WPCL is three years, ***see*** 42 Pa.C.S.A. § 260.9a(g), and the statute of limitations for breach of contract is four years, ***see*** 42 Pa.C.S.A. § 5525(8).

- 13 -

Paragraph 5 of the agreement is language you proposed. While I think I can understand how you read the 'if still employed' clause to create some ambiguity as regards the fund-level carry, as regards the Gain-specific 'carry' there can be no doubt about the intent and meaning of '. . . special recognition. . . to be earned, paid, and distributed at such time as the distribution is made to . . . Limited Partners.' Obviously this language is all contextualized by the fact that I was not an LP myself, by the lack of a predecessor agreement or other basis for an 'if still employed' comparison, and most of all by the performance gap between Gain and XATF.

I think we all expected at the time of the agreement, and still hope today, that XATF would and will make payouts. (I'm actually quite encouraged by your email in this regard — if you were thinking about me on this deal but expecting to pay all early simultaneously, XATF must be pretty close to paying out.) Nonetheless, I think we should prepare for the possibility that Gain winds up positive and XATF negative by clarifying the language of paragraph 5 as soon as possible.

[Message from Glenn Rieger, Cross Atlantic CEO to Andrews] . . .

It has been a while, I hope all is well! Gain has made a lot of progress since your resignation from XACP, and continues to be one of our better performing companies. As we were putting this transaction together with Tudor I had in the back of my mind our contractual obligations to you. Believe me if I felt there was an obligation to payout to you, I would be the first to contact you because that would mean a payout to me as well.

The $10MM deal with Tudor was a series C round with all but $1MM being used to redeem common A & B stock. Mark is the largest recipient in the group clearing over $6MM personally. XATF is receiving $1.1MM to be distributed to its IP's while retaining between 18.8 -19.4% ownership based on an EBITDA ratchet that will not be finalized until 12/31/04.

The operative sentence of your agreement is the last sentence of paragraph #5 — "Distributions of your participation in these carried interests will be in all cases identical to what you would have received if still employed by the funds." Since XATF is not into its carry at this time, there is no distribution to the GP

- 14 -

under the carry provision of the Partnership Agreement and hence, no distribution to any employees/partners/others from the GP as a result of this transaction. I will keep you posted on the outcome of the fund as it may relate to any carry as those events occur.

[Message from Brian Adamsky, Cross Atlantic's Chief Financial Officer to Glenn Rieger copying e-mail from Andrews:] . .

We need to respond to this. Either you [or] I should do it.

Hey Brian

I saw the press release for Gain's round with Tudor on VentureWire, and noticed in Mark's quote a reference to "liquidity to existing shareholders". Did XACP sell some or all of its position into the round? If so, the sale would trigger an obligation under my separation agreement, so please advise as to the amount and timing of payment to me.

[Message from Glenn Rieger to Andrews:] . . .

distribution to the GP under the carry provision of the Partnership Agreement and hence, no distribution to any employees/partners/others from the GP as a result of this transaction. I will keep you posted on the outcome of the fund as it may relate to any carry as those events occur.

(Trial Exhibit E-Mail chain, September 4-9, 2003, at Plaintiff's Exhibit 6 pp. 1-2; Plaintiff's Answer in Opposition to Defendants' Motion for Summary Judgment, 1/15/13, at Exhibit I).

Andrews contends that Cross Atlantic did not repudiate the separation agreement. (*See* Andrews' Brief, at 51-58). Moreover, Andrews argues that each payment owed to him under the separation agreement gave rise

to distinct causes of action, each with its own limitations period.[8]  (**See** **id.** at 47-51).

The trial court found it could not rule on the statute of limitations issue as a matter of law because reasonable minds could differ about the beginning of the limitations period.  (**See** Trial Ct. Op., 1/16/15, at 5-6). The trial court explained its reasoning as follows:

> In this case, the question of when the statute of limitations began was not clear.  It was [Cross Atlantic and Caldwell's] position that Andrews was aware of all of his claims in 2003 when [Cross Atlantic and Caldwell] notified him of their contrary interpretation of [p]aragraph 5.  Applying [Cross Atlantic and Caldwell's] reasoning, all of Andrews['] claims would be barred by the statute of limitations.  It was Andrews['] position that [Cross Atlantic and Caldwell] prevented him from obtaining the information necessary for him to assess whether he had any claims against Cross Atlantic.  Andrews testified that he requested information from Brian Adamsky, Cross Atlantic's Chief Financial Officer, about the corporate distributions on December 2, 2000.  He also spoke with Mr. Adamsky later and was told that there were no distributions.  Andrews testified he contacted Cross Atlantic by phone in the following years without receiving a direct response.  He finally wrote an email to Mr. Adamsky on January 16, 2003.  Mr. Adamsky responded that there would be no distributions in 2003, but a press release announced there was a distribution.  Andrews contacted Mr. Adamsky on September 4, 2003 requesting an explanation.  Mr. Rieger, Cross Atlantic's Chief Executive Officer, responded by email on September 9, 2003 and explained that payment was not forwarded to Andrews because [p]aragraph 5 was not triggered.

---

[8] Cross Atlantic and Caldwell acknowledge that, absent repudiation, a separate and distinct cause of action begins for each periodic payment as it becomes due.  (**See** Cross Atlantic and Caldwell's Brief, at 50-51).

Andrews explained to the jury that since the information he needed to assess whether he was entitled to further compensation was in Cross Atlantic's control, he had great difficulty discovering when other disbursements were made. Andrews testified that he became aware of subsequent distributions at different times and many months after the distributions were made. Under these facts, what Andrews knew about the corporate distributions and when he knew it was unclear.

(**Id.** at 7-8) (record citations and footnotes omitted). We agree with the trial court's reasoning.

This Court has stated, "[a]s a general rule, a statute of limitations begins to run when a plaintiff's cause of action arises or accrues. In a contract case, a cause of action accrues when there is an existing right to sue forthwith on the breach of contract." **Leedom v. Spano**, 647 A.2d 221, 226 (Pa. Super. 1994) (citations and internal quotation marks omitted). However, the Pennsylvania Supreme Court has held that:

. . . in some circumstances, although the right to institute suit may arise, a party may not, despite the exercise of diligence, reasonably discover that he has been injured. In such cases the statute of limitations does not begin to run at the instant the right to institute suit attaches, rather the discovery rule applies. The discovery rule is a judicially created device which tolls the running of the applicable statute of limitations until the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct. Pursuant to application of the discovery rule, the point at which the complaining party should reasonably be aware that he has suffered an injury is a factual issue best determined by the collective judgment, wisdom and experience of jurors. Thus, once the running of the statute of limitations is properly tolled, only where the facts are so clear that reasonable minds **cannot differ** may the commencement of the limitations period be determined as a matter of law.

- 17 -

*Crouse v. Cyclops Indus.*, 745 A.2d 606, 611 (Pa. 2000) (citations and quotation marks omitted, emphasis in original). Moreover, it is settled law in Pennsylvania "that where installment or periodic payments are owed, a separate and distinct cause of action accrues for each payment as it becomes due." *Ritter v. Theodore Pendergrass Teddy Bear Prod., Inc.*, 514 A.2d 930, 935 (Pa. Super. 1986) (citations omitted).

The standard for proving anticipatory repudiation is a strict one. In a recent decision the Pennsylvania Supreme Court stated, "anticipatory repudiation or breach requires an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so." *Harrison v. Cabot Oil & Gas Corp.*, 110 A.3d 178, 184 (Pa. 2015) (quotation marks and citation omitted). In *Harrison*, our Supreme Court held that the filing of a declaratory judgment action contesting the scope or validity of a lease did not constitute an anticipatory repudiation of the lease. *See id.* at 185-86. Further, the burden of proving repudiation rests on the party asserting it. *See Shafer v. A.I.T.S., Inc.*, 428 A.2d 152, 155 (Pa. Super. 1981).

Our Supreme Court's decision in *2401 Pa. Ave. Corp. v. Fed'n of Jewish Agencies of Greater Phil.*, 489 A.2d 733 (Pa. 1985) demonstrates the difficulty of meeting this burden. In *2401 Pa. Ave. Corp.*, the owners of a building in downtown Philadelphia claimed that the Federation had committed an anticipatory breach of their lease to rent a portion of the

building. ***See id.*** at 734. The defendant had been unable to take possession of the leased space because a prior tenant was still occupying a portion of the space and the plaintiff had granted it an extension and asked the defendant to grant a further extension to the tenant. ***See id.*** at 734-35. In the interim, the defendant found and purchased a different building. ***See id.*** at 735. In order to prove the anticipatory breach, the plaintiff relied on the following facts:

> (a) on July 24, 1974 [Federation's] statement that "he was advised that the lease would have no effect because of the inability of [appellant] to give possession in May as called for in the lease;"
>
> (b) an inconclusive meeting with [Federation] on July 30, 1974, followed by
>
> (c) a meeting with [Federation] on August 1, 1974, at which time [Federation] declined to grant an extension because "they were being advised by their attorneys that any extension given by the Federation would in essence, acknowledge the validity of the lease," and
>
> (d) on this same date [Federation's] ... informing [Walnut] that "the Federation did not want to occupy [the four floors], had no use for it, and would not consider any type of extension without a release, of liability from the lease."

***Id.*** at 737 (emphasis and footnote omitted). Our Supreme Court held that these facts were insufficient to prove an anticipatory breach because none of the statements demonstrated "a definitive indication that [defendant] intend[ed] to act on this advice or treat the contract as void." ***Id.*** at 737.

Here, Cross Atlantic and Caldwell are not even close to meeting this strict burden. We have reviewed the e-mail exchange; we see nothing in it

that showed "an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so." **Harrison**, **supra** at 184 (citations and quotation marks omitted). At most, the e-mail exchange demonstrated that the parties were trying to work out differences in interpretation of paragraph 5, there would be no payment made in September 2003, but Cross Atlantic would keep Andrews informed about the possibility of future payments.[9] (**See** Trial Exhibit E-Mail chain, September 4-9, 2003, at Plaintiff's Exhibit 6 pp. 1-2; Plaintiff's Answer in Opposition to Defendants' Motion for Summary Judgment, 1/15/13, at Exhibit I). Thus, Cross Atlantic and Caldwell's claim that there was an anticipatory repudiation of the Separation Agreement lacks merit. **See Harrison**, **supra** at 185-86; **2401 Pa. Ave. Corp.**, **supra** at 737. Because this claim lacks merit, the trial court did not err in finding that it could not as a matter of law, find Andrews' claims barred by the statute of limitations. **See Crouse**, **supra** at 611. Therefore, there is no basis for us to reverse the trial court's denial of Cross Atlantic and Caldwell's motion for JNOV and/or a new trial. **See Kindermann**, **supra** at 193; **Am. Future Sys.**, **supra** at 1215.

---

[9] Because the e-mail exchange did inform Andrews that he would not receive a payment in September 2003, the trial court correctly granted Cross Atlantic and Caldwell's motion for a nonsuit as to that payment. (**See** N.T. Trial, 8/28/13, at 81-82).

It is not entirely clear what Cross Atlantic and Caldwell claim in their third issue. They seem to intermingle an argument that the trial court erred in determining that the third sentence of paragraph 5 was ambiguous on its face and therefore allowing Andrews' claim to proceed to a jury and a claim that the jury's verdict was erroneous. (*See* Cross Atlantic and Caldwell's Brief, at 55-60). For the reasons discussed below, we find that Cross Atlantic and Caldwell waived their challenge to the jury's verdict. Further, we find that the trial court did not err in finding that paragraph 5 is ambiguous.

As noted above, we cannot overturn the denial of a motion for JNOV unless no "basis exists upon which the jury could have properly made its award." *Am. Future Sys.*, *supra* at 1215 (citation omitted). We review a trial court's denial of a motion for a new trial for an abuse of discretion. *See Kindermann*, *supra* at 193.

In their Statement of the Questions Involved, Cross Atlantic and Caldwell never refer to the jury's verdict. (*See* Cross Atlantic and Caldwell's Brief, at 5). Instead, they challenge the interpretation of the contract as a matter of law, which appears to be a challenge to the trial court's decision to submit the matter to the jury because it found paragraph 5 to be ambiguous. This Court will not consider an issue not set forth in the Statement of Questions Involved, thus Cross Atlantic and Caldwell waived this issue. *See Southcentral Employment Corp. v. Birmingham Fire*

*Ins. Co. of Pa.*, 926 A.2d 977, 983 n.5 (Pa. Super. 2007) (holding that issues not explicitly raised in Statement of Questions Involved are waived); *see also* Pa.R.A.P. 2116(a).

Moreover, even if Cross Atlantic and Caldwell had raised the issue in the Statement of Questions Involved we would still find it waived. As noted above, Cross Atlantic and Caldwell intermingle their argument that the trial court should have found that paragraph 5 was ambiguous with their argument that the jury verdict was erroneous. (*See* Cross Atlantic and Caldwell's Brief, at 55-60). Further, Cross Atlantic and Caldwell never specify whether they are challenging the sufficiency of the evidence or the weight of the evidence or both. (*See id.*). Their argument does not include any discussion of the scope and standards of review for either sufficiency or weight challenges. (*See id.*). There is no citation to any case law with respect to weight or sufficiency. In addition, the argument contains only a single citation to the record. (*See id.* at 56-57). Thus, it is impossible to determine what evidence Cross Atlantic and Caldwell believe was insufficient and/or improperly weighed. Lastly, those references to case law contained in the argument go to the issue of the trial court's decision, not the jury's decision. (*See id.* at 55-60).

This Court will not act as counsel and will not develop arguments on behalf of an appellant. *See Bombar v. West Am. Ins. Co.*, 932 A.2d 78, 94 (Pa. Super. 2007). When deficiencies in a brief hinder our ability to

conduct meaningful appellate review, we can dismiss the appeal entirely or find that the appellant waived certain issues. *See* Pa.R.A.P. 2101. Because Cross Atlantic and Caldwell have failed to develop their claim with respect to the jury's verdict, they waived it. *See id.*; *see also Bombar*, *supra* at 94.

Cross Atlantic and Caldwell claim that the trial court erred as a matter of law in finding paragraph 5 ambiguous. (*See* Cross Atlantic and Caldwell's Brief, at 55-60). They maintain that in so doing the trial court violated basic principles of contract law. First, Cross Atlantic and Caldwell assert that an interpretation should not be given to one part of a contract that will annul another part of it, claiming that a finding that sentence three is ambiguous nullifies sentence four and renders the two sentences inconsistent. (*See id.* at 56-57). Second, they argue that in finding paragraph 5 ambiguous, the trial court failed to give the same meaning to terms in adjacent provisions of the contract. (*See id.* at 58). Third, Cross Atlantic and Caldwell allege that to find paragraph 5 ambiguous would bring about an absurd result. (*See id.* at 58-59).

Andrews does not dispute the principles of construction identified by Cross Atlantic and Caldwell. (*See* Andrews' Brief, at 64). Instead, Andrews argues that the failure to define the term "carried interest" in the separation agreement renders paragraph 5 ambiguous. (*See id.* at 59). Moreover, he argues that his interpretation of the third sentence does not annul the fourth

- 23 -

sentence, does not give different meanings to the same language, and does not reach an absurd result. (**See id.** at 64-66).

Here, as noted above, paragraph 5 reads as follows:

> By the end of this Severance Period, you will have vested one year of services towards 1.0% of carried interest in Cross Atlantic Technology Fund, L.P. and 0.5% carried interest in the Co-Investment 2000 Fund, L.P. Therefore, you will receive 0.2% and 0.1% carried interest as your earned and vested carry in Cross Atlantic Technology Fund, L.P. and The Co-Investment 2000 Fund, L.P., respectively. In addition, as special consideration for your effort put forth on GAIN Capital, we will offer you a full 1.0% and 0.5% carried interest on that particular transaction to be earned, paid and distributed at such time that the distribution is made to all other Limited Partners of the funds. Distributions of your participation in these carried interests will be in all cases identical to what you would have received if still employed by the funds.

(Separation agreement, 7/05/00, at 2 ¶ 5).

This Court has stated,

> [i]n cases of a written contract, the intent of the parties is the writing itself. If left undefined, the words of a contract are to be given their ordinary meaning. When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. When, however, an ambiguity exists, [parole] evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.

**W.A.M. v. S.P.C.**, 95 A.3d 349, 353 (Pa. Super. 2014). We have further stated

A contract's language is unambiguous if it can be determined without any other guide than knowledge of the simple facts on which its meaning depends. When the contract is clear and unambiguous, the meaning of the contract is ascertained from the writing alone. A court must not distort the meaning of the language or resort to a strained contrivance to find an ambiguity. Additionally, a mere disagreement between the parties regarding the proper construction of the language does not render the contract ambiguous. . . .

*Neducsin v. Caplan*, — A.3d —, 2015 WL 4496406 at *7 (Pa. Super. July 23, 2015) (citations omitted).

Initially we note that Cross Atlantic and Caldwell's position that we should give the term "carried interest" the same meaning throughout the contract is reasonable. (*See* Cross Atlantic and Caldwell's Brief, at 56). Andrews' contention that the opening phrase of the third sentence, "as special consideration for your effort put forth on GAIN Capital" differentiates the carried interest in sentence 3 from the carried interest in sentences one and two is equally reasonable, particularly, as he notes, because the separation agreement does not define the term (*See* Andrews' Brief, at 59, 61).

Further, Cross Atlantic and Caldwell's position that paragraph 5 is unambiguous is undermined by the fact that their argument that finding paragraph 5 ambiguous would mean annulling sentence four is based not upon the written language of paragraph 5 but intrinsic evidence from trial. (*See* Cross Atlantic and Caldwell's Brief, at 56-57). Moreover, we do not agree that interpreting sentence three as Andrews does necessarily annuls

sentence four. Rather, as noted above, the phrase "special consideration" sets sentence three apart, as does the phrase at the end of the sentence, "all other Limited Partners", which seems to imply that, for purpose of this carried interest, Andrews is being treated as a limited partner. Thus, it can be reasonably argued that because these phrases set sentence three apart, sentence four clarifies that the carried interest in sentences one and two are being treated differently from those in sentence three.

We note that neither party points to any portion of the separation agreement that explains how Cross Atlantic would have treated Andrews if "still employed" and if that distribution is different from the distribution mentioned in sentence three. Accordingly, we agree with Andrews that, because the separation agreement does not define carried interest, and because the language in sentence three implies that the parties intended to treat the carried interest and distribution manner in that case differently from those is sentences one and two, paragraph 5 is ambiguous. *See Kripp v. Kripp*, 849 A.2d 1159, 1164-65 (Pa. 2004) (finding alimony provision in property settlement agreement ambiguous where provision had several reasonable constructions); *W.A.M.*, *supra* at 353. Thus, the trial court did not err in declining to find paragraph 5 unambiguous as a matter of law. *See W.A.M.*, *supra* at 353. Therefore, there is no basis for us to reverse the trial court's denial of Cross Atlantic and Caldwell's motion for JNOV and

or a new trial. **See Kindermann**, **supra** at 193; **Am. Future Sys.**, **supra** at 1215.

In his first issue on cross-appeal, Andrews claims that the trial court erred in finding that he was not entitled to liquidated damages on his WPCL claims. (**See** Andrews' Brief, at 66-71). Prior to addressing the merits of this cross-appeal, we must ascertain whether it is properly before us. Timeliness of an appeal is a jurisdictional question. "When a statute fixes the time within which an appeal may be taken, the time may not be extended as a matter of indulgence or grace." **Commonwealth v. Pena**, 31 A.3d 704, 706 (Pa. Super. 2011) (citation omitted). Our Rules of Appellate Procedure mandate that the notice of appeal "shall be filed within 30 days after the entry of the order from which the appeal is taken." Pa.R.A.P. 903(a). Time limitations on filing appeals are construed strictly. **See Commonwealth v. Perez**, 799 A.2d 848, 851 (Pa. Super. 2002).

Here, the prothonotary entered judgment on May 22, 2014. The thirtieth day was Monday, June 23, 2014.[10] Appellant did not file his notice of appeal until June 25, 2014, the thirty-second day. Thus, this cross-appeal is untimely and we are constrained to quash the cross-appeal filed at 1934 EDA 2014.

---

[10] The actual thirtieth day was June 21, 2014, a Saturday.

In his second issue on cross-appeal,[11] Appellant argues that the trial court erred in denying his request to recover expert fees and other costs[12] associated with his successful WPCL claim. (**See** Andrews' Brief, at 72-76). We disagree.

Here, the trial court found as a matter of law that the WPCL did not allow for recovery of costs. (**See** Trial Court Opinion, 8/28/14, at 7). "An issue of statutory construction presents a pure question of law and our standard of review is *de novo* and our scope of review is plenary." **In re T.B.**, 113 A.3d 1273, 1276 (Pa. Super. 2015) (citation omitted).

The WPCL provides, "[t]he court in any action brought under this section shall, in addition to any judgment awarded to the plaintiff or plaintiffs, **allow costs for reasonable attorneys' fees of any nature** to be paid by the defendant." 43 Pa.C.S.A. § 260.9a(f) (emphasis added). The WPCL does not define the word "costs." **See** 43 Pa.C.S.A. § 260.2(a). Andrews does not point to any case, and our research has discovered none, that specifies the nature of the costs referred to in Section 260.9a(f).

With respect to the meaning of costs, this Court has stated:

> "It is a general rule in our judicial system, stemming from the Statute of Gloucester, 6 Edw. 1, c. 1 (1275), that costs

---

[11] We note that Andrews appealed the denial of his motion for costs on June 3, 2014. Thus, this cross-appeal is timely.

[12] Andrews does not specify the nature of the other costs. (**See** Andrews' Brief, at 72-76).

inherent in a law suit are awarded to and should be recoverable by the prevailing party." ***De Fulvio v. Holst***, 239 Pa.Super. 66, 362 A.2d 1098, 1099 (1976). Important to our analysis of all of Appellant's issues is the distinction between record costs (such as filing fees) and actual costs (such as transcript costs and witness fees). Record costs are "the costs of proceeding in court, not those of preparation, consultation, and fees generally." ***Id. See also Harmer v. Horsham Hospital, Inc.***, 60 Pa.Cmwlth. 525, 431 A.2d 1187, 1188 (1981) (stating that "the law is clear that, absent specific statutory authority otherwise, only record costs of proceedings in court are recoverable, and not costs of preparation, consultation, or fees generally").

***Zelenak v. Mikula***, 911 A.2d 542, 544-45 (Pa. Super. 2006). Further,

. . . The general rule in an action at law is that the costs inherent in a lawsuit are awarded to and should be recoverable by the prevailing party. These recoverable costs are the costs of proceeding in court, not those of preparation, consultation, and fees generally. Costs not incurred in the court action, including counsel fees, are recoverable only on the basis of statutory authority. Only in the rarest of circumstances is the unsuccessful party made to bear all of the expenses incurred in the litigation.

***Gregory v. Harleysville Mut. Ins. Co.***, 542 A.2d 133, 135-36 (Pa. Super. 1988 (citations omitted).

In concluding that the WPCL did not allow for the recovery of expert fees and other out-of-pocket costs, the trial court compared an earlier version of the WPCL with the current version. (***See*** Trial Ct. Op., 8/28/14, at 10). Prior to June 27, 1980, the WPCL stated, "The court in any action brought under this section shall, in addition to any judgment awarded to the plaintiff or plaintiffs, **allow costs of the action, including costs for reasonable attorneys' fees of any nature** to be paid by the defendant."

Section 302 of Act 1980, Oct. 5, P.L. 693, No. 142 (emphasis added). The trial court found that while the earlier version of the WPCL arguably allowed for the payment of expert fees and such costs, the repeal of that language and the substitution of "allow costs for reasonable attorneys' fees of any nature[,]" 43 Pa.C.S.A. § 260.9a(f), demonstrated a legislative intent to "limit the a prevailing party's recovery to reasonable attorneys' fees." (Trial Ct. Op., 8/28/14 at 10).

Andrews disagrees, arguing that such an interpretation is at odds with the remedial purpose of the WPCL. (**See** Andrews' Brief, at 72-74). Further, Andrews downplays the significance of the changing of language, noting that there is no legislative history discussing it. (**See id.** at 73). Lastly, while acknowledging that decisions of the federal courts are not binding on this Court, he claims that those courts have issued a number of decisions under the current version of the law awarding costs. (**See id.** at 75-76).

> In resolving this issue, we are guided by the settled principles set forth in the Statutory Construction Act, including the primary maxim that the object of statutory construction is to ascertain and effectuate legislative intent. 1 Pa.C.S. § 1921(a). In pursuing that end, we are mindful that "when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). As a general rule, the best indication of legislative intent is the plain language of a statute. In reading the plain language, "words and phrases shall be construed according to rules of grammar and according to their common and approved usage," while any words or phrases that have acquired a "peculiar and appropriate meaning" must be construed according to that meaning. 1 Pa.C.S. § 1903(a). It is only when "the words of the statute are not explicit" on the point at issue that resort to statutory construction is appropriate. 1

> Pa.C.S. § 1921(c). . . . Finally, in ascertaining legislative intent, the Statutory Construction Act "requires a presumption that the General Assembly did not intend a result that is absurd or unreasonable." 1 Pa.C.S. § 1922(1)[.]

***Malt Bev. Distrib. Ass'n v. Pa. Liquor Control Bd.***, 974 A.2d 1144, 1149 (Pa. 2009) (some citations omitted).

Here, we cannot dismiss the significance of the change of language between the pre-1980 version of the WPCL and the current version. In construing a statute, courts must attempt to give meaning to every word, as we cannot assume that the legislature intended any language to be mere surplusage. ***See*** 1 Pa.C.S. §§ 1921(a), 1922(2). We agree with the trial court that the pre-1980 version of the WPCL plainly allowed for the awarding of costs. (***See*** Trial Ct. Op., 8/28/14, at 10). The language, "allow costs of of the action, including costs for reasonable attorneys' fees[,]" Section 302 of Act 1980, Oct. 5, P.L. 693, No. 142, makes it evident that the legislature intended to allow a successful plaintiff to collect all costs of the action, which included attorneys' fees. However, the legislature changed that language to the current version of the statute, which says, "allow costs for reasonable attorneys' fees." 43 Pa.C.S.A. § 260.9a(f). The use of the word "for" in between the words "costs" and "reasonable attorneys' fees" demonstrates the intent of the legislature to limit those recoverable costs to attorneys' fees. To construe it otherwise would both ignore the decision of the legislature to change the wording and produce such a strained reading of the language as be absurd. While we are sympathetic to Andrews' position that

such a reading appears to violate the spirit of the remedial purpose of the WPCL, we cannot disregard the plain language of the current version of the statute. ***See Malt Bev. Distrib. Ass'n.***, ***supra*** at 1149; 1 Pa.C.S. §§ 1921(a), 1922(2). Because Andrews' second issue lacks merit, the trial court did not err in denying his motion for costs.[13]

Accordingly, for the reasons discussed above we affirm the judgment of May 22, 2014. Further, we quash Andrews' cross-appeal filed to number 1934 EDA 2014.

Affirmed in part. Quashed in part.

_____

[13] We are unpersuaded by Andrews' reliance on the decisions of the federal courts. As he acknowledged, their decisions are not binding on this Court. ***See Kleban v. Nat. Union Fire Ins. Co. of Pittsburgh***, 771 A.2d 39, 43 (Pa. Super. 2001). Further, of the nine federal cases cited by Andrews, six fail to define the word "costs," or specify in any way what costs the court awarded. ***See Barnhart v. Compugraphic Corp.***, 936 F.2d 131 (3d Cir. 1991); ***Kollman v. Transtech Airport Solutions, Inc.***, 2011 WL 6020168 at *4 (W.D. Pa. December 2, 2011); ***Zebroski v. Gouak***, 2011 WL 3565223, at *5 (E.D. Pa. August 12, 2011); ***Ezekian v. Anacomp, Inc.***, 2003 WL 22518566, at *5 (E.D. Pa. October 9, 2003); ***Bandy v. LG Indust., Inc.***, 2003 WL 22100876, at *2 (E.D. Pa. July 23, 2003); ***Hanley v. Am. Inline Graphics, Inc.***, 1992 WL 157750 at *3 (E.D. Pa. June 30, 1992). Thus it is not at all apparent that the courts awarded the plaintiffs in those cases the types of costs that Andrews seeks. A sixth case not only fails to define costs, it is also unclear if the trial court awarded costs pursuant to the WPCL or one of the other statutes that the plaintiff sued under. ***See Goodwin v. Visiting Nurse Assoc. Home Health Servs.***, 831 F.Supp. 449, 454 (E.D. Pa. 1993). While the remaining two cases do specify the nature of the costs that the trial court awarded, neither contains an award for expert fees. ***See Blagrave v. Nutrition Mgmt. Servs. Co.***, 2009 WL 440299, at *7 (E.D. Pa. February 20, 2009); ***Tambay v. Peer***, 2005 WL 1168367, at *9 (E.D. Pa. May 17, 2005).

Judge Lazarus joins the Memorandum.

Judge Jenkins files a Concurring and Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/9/2015